IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

TYRONE D. MURRY,                        )
                                        )
                Plaintiff,              )
        v.                              )
                                        )       No. 1:10-cv-771
JACOBS TECHNOLOGY, INC., and            )
AT&T GOVERNMENT,                        )
SOLUTIONS, INC.,                        )
                                        )
                Defendants.             )

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants Jacobs Technology, Inc.

("Jacobs") and AT&T Government Solutions, Inc.'s ("AT&T") Motions for

Summary Judgment. For the reasons stated below, Jacobs's Motion (Doc. # 32) is

GRANTED in entirety, and AT&T's Motion (Doc. # 34) is GRANTED IN PART, and

DENIED as to Plaintiff Tyrone Murry's discriminatory discharge claim.

Federal employment discrimination cases invoking Title VII of the Civil Rights

Act of 1964 ("Title VII") are legion.  This case, however, presents the more

unusual question of when a contractor may be liable under Title VII for adverse

action against a subcontractor's employee, and similarly, whether the

subcontractor may be liable when its decision to terminate an employee resulted

from the contractor's decision to remove the employee's access to the relevant

work site.

I.

Viewed in the light most favorable to Mr. Murry, Fed. R. Civ. P. 56(e), the material facts are as follows. Mr. Murry, an African-American male and United States Air Force veteran, was hired by Jacobs in November 2008 to work on a confidential federal government project ("Project") for Special Operations Command in Chatham County, North Carolina.[1] AT&T was the prime contractor at the Project, working with other subcontractors, including Jacobs. Mr. Murry responded to a job description advertised as "Mid-Level Electrical/RF Engineer." Michael Hatcher, the Jacobs Program Manager responsible for finding employees for the part of the Project that Jacobs was to perform, contacted Mr. Murry upon receiving his resume, asking for more information regarding Mr. Murry's experience with radio-frequency ("RF") systems and communication devices. Mr. Murry responded with an overview of more than 20 years experience as an electrical engineer, including work in the radio maintenance field and mobile base communications. Jacobs opted to hire Mr. Murry, and sent him a formal offer letter for the position of "Mid Level Electrical/Electronics Engineer." The offer letter included a document describing the terms of employment, including the condition that: "Employment is contingent upon your ability to perform the essential

---

[1] Information about the Project is "highly classified," and all employees on the Project were required to have security clearance. Many details about the work performed at the Project are confidential and are not before the Court.

functions of the Mid Level Electrical Engineer position for which you are being hired, as well as any subsequent positions to which you may be assigned." Mr. Murry signed this document on November 6, 2008.

AT&T played no role in selecting the employees hired by the subcontractors, though the company did receive Mr. Murry's resume after Jacobs hired him. The terms of the contract between AT&T and Jacobs provided that AT&T would not exercise any direct control or supervision over Jacobs employees. The contract, however, provided that AT&T had the right at any time and for any reason to reject Jacobs employees or have Jacobs remove employees from the Project. The contract also details the categories of employees that Jacobs was responsible for supplying, including a description of three positions for "Electrical/Electronics Engineer." The education and experience requirements for the listed positions are identical, except that a "senior" electrical engineer position required twelve years of experience, while the "midlevel" engineer position required seven years of experience, in the following areas: "Design, development, production, test, evaluation experience with one or more types of Electronic Systems / Subsystems / Components. These [] include, but are not limited to, the following: Radar, Sonar, Communications, Aircrew Equipment, Signal Processors, Antennas, Armament Integration, Avionics, COMSEC, Cryptography, Electromagnetic Effects, Fire Control, Navigation, Networks." While Mr. Murry was hired as the mid-level engineer, John Kensmoe, an engineer with 30 years of experience, was hired as

3

the senior engineer for the Jacobs team.

Initially, eighteen individuals worked at the Project: eight AT&T employees, seven Jacobs employees, and three employees of other subcontractors. Though Mr. Hatcher was the Jacobs Project Manager, he was stationed in Florida, and accordingly designated Kent Patton, who is African-American, to be the lead on-site Jacobs employee. Any concerns or comments were to be raised with Mr. Patton, who would pass them to Mr. Hatcher. When Mr. Murry began working at the Project on November 10, Tom Morreale was AT&T's on-site program manager, and Grant Davis worked as AT&T's security manager. Despite the language to the contrary in the contract, the Jacobs employees were, in practice, under the supervision and control of the AT&T managers. Mr. Morreale and Mr. Davis assigned job tasks, controlled the Jacobs employees' schedule and behavior, and threatened discipline. Mr. Patton, the Jacobs on-site lead, was ignored or brushed-off, to the point that Mr. Hatcher requested that AT&T acknowledge Mr. Patton's role as team lead.

Indeed, Mr. Morreale's and Mr. Davis's controlling and unpleasant behavior caused much consternation among Jacobs employees. Jacobs employees complained to Mr. Hatcher regarding the supervisors' inappropriate language and belittling behavior. One such complaint describes the AT&T management attitude

4

as "we own you, and you'll do exactly what we tell you." Doc. 32-1 at 52.[2]  This

tense relationship was exacerbated by the physical working conditions at the

Project site.  At the outset of work at the Project, everyone on the team was

required to perform "initial operating capabilities" work; the building on-site was

outdated and needed renovation and clearing before the technical work (for which

the employees were ostensibly hired) could commence. It is undisputed that all

employees at the site were assigned to tasks such as picking up trash, performing

construction and installation tasks, and replacing tiles. The tile replacement project

in particular triggered conflict between AT&T and Jacobs employees. Jacobs

employees expressed concerns that the tiles they were removing contained

asbestos.[3]  Mr. Murry, who had experience with facilities maintenance and safety

issues, also offered input regarding electrical and structural issues with the building

as these start-up tasks continued. Mr. Patton reported the Jacobs employees'

safety concerns to Mr. Hatcher, along with concerns regarding the Jacobs team

being required to ready the building for use. In response to employees raising such

concerns, Mr. Davis threatened to fire the Jacobs employees for complaining to

outside supervisors about working conditions, and told a story about how he had

caused an employee at a past project to be fired for complaining.

---

[2] In this same communication, Mr. Kensmoe states: "I hope this can be resolved without any retribution toward the Jacobs team working at the JIFFY facility.  Obviously, that would make matters even worse for us." Id.

[3] The parties dispute whether the employees were provided with protective equipment for this task.

One incident which caused particular conflict between AT&T supervisors and Jacobs employees, and which is material to this lawsuit, occurred at a Thanksgiving lunch event. On November 21 2008, employees from the Project went to a local restaurant. Mr. Murry entered the restaurant with Mr. Patton and a white female, and sat with another black male and white female. After they entered the restaurant, Mr. Morreale, who was sitting with Mr. Davis, made a comment to the effect of: "this is why we kill the black squirrels, for mixing with the white squirrels."[4] Mr. Murry was upset by the comment, because "the whole attitude of it was racial and derogatory." He told Mr. Patton that he wanted the incident to be reported, and Mr. Patton quickly reported the matter to Mr. Hatcher. In response, Mr. Hatcher sent an email to Jacobs employees assuring them that Mr. Morreale's comment was inappropriate, and that he would be speaking with AT&T to ensure that similar incidents would not occur in the future. Mr. Hatcher also asked the Jacobs employees to provide him with a write-up regarding any issues with AT&T; Mr. Murry did not do so.

Mr. Hatcher then spoke with Stephen Dennis, the AT&T Associate Director

---

[4] AT&T seems to argue that because Mr. Davis had told a story the day before about killing black squirrels who attacked an albino squirrel in his driveway, the context somehow insulates Mr. Morreale's comment from a racist label, arguing that Mr. Murry admitted that the comment "wasn't necessarily racial." Aside from the fact that this distorts Mr. Murry's deposition testimony, the fact that Mr. Morreale's comment was not a *non sequitur* does not diminish the racist and threatening nature of the remark. Mr. Davis' discussion of the incident in his affidavit likewise misses the point. He describes his commentary to Jacobs employees as stating that his "squirrel story" had been interpreted as a story about race and that "the story was not intended to be a racial joke." Doc. 36-3 ¶ 8. But the problem was Mr. Morreale's seemingly pointed comment, not Mr. Davis' story.

of Joint Programs, who assured Mr. Hatcher that he would speak to Mr. Davis and Mr. Morreale and that the situation would not happen again. Mr. Hatcher did not disclose which Jacobs employees had raised concerns about the incident. Mr. Dennis contacted Mr. Morreale told him that such an incident could not happen again, and that he and Mr. Davis needed to address the issue with all personnel assigned to the Project.[5] In addition, Mr. Hatcher spoke with both Mr. Davis and Mr. Morreale during a teleconference and advised them of Jacobs's policy against racial harassment. Mr. Hatcher also sent Jacobs employees a follow-up email and directed them to let him know if matters did not improve.

The squirrel comment is the only explicitly racial statement or conduct that Mr. Murry has identified. Nonetheless, both Mr. Murry and Mr. Patton have described Mr. Davis's behavior towards the two of them as subtly racist. For example, if Mr. Murry and Mr. Patton were walking with white employees and encountered Mr. Davis, Mr. Davis would speak to the white employees but intentionally ignore Mr. Murry and Mr. Patton. Mr. Patton was bothered by the behavior and asked Mr. Murry if he had noticed the behavior as well. After Mr. Patton and Mr. Murry had experienced this behavior on several occasions, Mr.

---

[5] The parties dispute whether the squirrel comment was addressed at the Project work site. AT&T contends that Mr. Davis held a meeting at the work site to address the issue and apologize, and Mr. Davis's recollection is that Mr. Murry attended the meeting. Mr. Murry, on the other hand, states that AT&T did not respond to the issue on site.

7

Patton mentioned the issue to Mr. Hatcher.[6] In response, Mr. Hatcher told Mr. Davis and Mr. Morreale on a conference call that Mr. Patton should be acknowledged as the Jacobs lead and kept in the loop regarding management of Jacobs employees. Mr. Murry also expressed concerns to the Jacobs General Manager, Larry Tellman, when he visited the Project on December 12, 2008; however, Mr. Murry does not state whether the concerns he expressed were related to safety issues, general supervisory behavior issues, racial issues, or otherwise.

AT&T supervisors gave Mr. Murry specific negative feedback on only one occasion. Around late December 2008 or early January 2009, Mr. Morreale, Mr. Davis, and another AT&T employee confronted Mr. Murry, believing that he was sleeping on the job. Mr. Murry then went to Mr. Morreale's office to discuss the incident.[7] Mr. Murry brought his blood pressure medication to Mr. Morreale's office, explaining that the medication had just been changed and was causing a severe headache. This headache in turn had caused him to rest briefly, which created the appearance of sleeping. Mr. Patton was not present for the conversation in Mr. Morreale's office, but Mr. Morreale called Mr. Hatcher while

---

[6] It is not stated in Mr. Patton's affidavit whether he described the problem with Mr. Davis as a racial issue – or as involving Mr. Murry at all – when he spoke to Mr. Hatcher. Mr. Hatcher contends that he "did not receive complaints from Mr. Murry or any other Jacobs employee of racial discrimination or racial harassment" until Mr. Murry raised the issue at his termination.

[7] AT&T details two incidents in which an AT&T representative claimed to have seen Mr. Murry sleeping; it is unclear whether either of those incidents was contemporaneous with or caused the meeting with Mr. Morreale that Mr. Murry describes.

Mr. Murry was present. Mr. Morreale accepted Mr. Murry's explanation regarding the medication, and apologized for asking questions related to medical information. Aside from this telephone call to address the conflict regarding the side effects of Mr. Murry's medication, AT&T did not inform Mr. Hatcher at any time that it was dissatisfied with Mr. Murry or that Mr. Murry's performance was lacking.

At some point in early-to-mid January 2009, Mr. Morreale was released from the Project, and Mr. Davis replaced him as Program Manager. Around the same time, some of the start-up work performed at the site began to transition into preparation for potential "live projects." For the entirety of Mr. Murry's time at the Project, however, building preparations, upgrades, and troubleshooting continued. After Mr. Davis took over for Mr. Morreale, he assigned Mr. Murry to work as a lead engineer on a task. Mr. Murry was told that he was to work with a "technician lead" but was not informed who that lead would be.[8] As part of this assignment, Mr. Davis asked for a list documenting the engineering department's needs. Mr. Murry drafted a one-page document in response, stating: "The current status of the three action items we were given the week of 19 Jan 2009 is still on hold awaiting further clarity from Justin. We (Ty [Murry], John [Kensmoe], Jim) were told that upon his return from his mission to W. VA he would be able to give us direction on how to handle the material. So at present the Items are locked in the safe in

_____

[8] AT&T states that the "technician lead" was Justin Hoffman. Mr. Murry, at his deposition, identified "Justin" as an individual who mimicked Grant Davis' racially-charged attitude, i.e., specifically ignoring Mr. Murry but acknowledging white employees.

9

Angela's office."  The document also outlined various building and safety renovations that the engineering department needed, including heating and cooling issues and the ongoing concern regarding asbestos dust. Mr. Murry provided this document to Mr. Hatcher on January 29, apparently after Mr. Davis disregarded it.[9]

A few days after Mr. Davis appointed Mr. Murry "lead engineer" for the above-mentioned task, a representative from the federal government, Michael Bentley, made a routine visit to the site. According to Mr. Murry, Mr. Bentley questioned him and Mr. Kensmoe on some components left over from a previous contract, which were unfamiliar to both Mr. Murry and Mr. Kensmoe.  Mr. Bentley asked their opinion about the operation of those parts for approximately two minutes. Following his visit, Mr. Bentley spoke with Mr. Davis and Mr. Dennis and raised concerns regarding Mr. Murry.  Mr. Davis and Mr. Dennis then discussed Mr. Murry amongst themselves.  Afterwards, in discussing Mr. Murry, Mr. Davis stated to Mr. Dennis that Justin Hoffman, as well as two technicians from other subcontractors had raised concerns about Mr. Murry's RF knowledge.[10]

AT&T subsequently determined that it would remove Mr. Murry from the Project, and informed Mr. Hatcher on February 3, 2009, that it would be "reading"

---

[9] For another assignment, Mr. Kensmoe and Mr. Murry were asked to write up a white paper/feasibility study. Because the task was RF-related, and Mr. Kensmoe had ample RF experience, he volunteered to do the research, while Mr. Murry wrote the report. When Mr. Kensmoe and Mr. Murry turned in the report, Mr. Davis told them he did not want it.

[10] Mr. Davis states that he "learned that . . . John Kensmoe . . . had RF knowledge and was able to absorb Mr. Murry's RF duties" when deciding that Mr. Murry should be removed from the Project. (Doc. # 36-3 ¶15).

Mr. Murry "off" the Project contract, i.e., terminating his access to the facility.

Mr. Hatcher requested documentation regarding AT&T's reasons for doing so, and

Mr. Davis provided him with an email stating that Mr. Murry "has little technical

and functional principles of the job. His position RF Engineer (Mid) requires direct

customer interaction - NOTE: In direct discussion with the customer-his abilities

where [sic] questioned."  In addition, Mr. Davis stated that Mr. Murry "lacks the

effectiveness of oral, written, or listening skills required to perform assignments

and interface with management, coworkers and the customer," and "lacks

effectiveness in dealing with peers, superiors and customer."  Mr. Hatcher

expressed frustration at AT&T's lack of warning regarding problems with Mr.

Murry's performance, and at his inability to provide input or to give Mr. Murry

opportunity to improve.

The next day, Mr. Hatcher told Mr. Murry of AT&T's decision.  Mr. Hatcher

explained that he had tried to talk AT&T out of releasing Mr. Murry, but had been

unable to do so once AT&T determined that Murry would be dismissed from the

facility." Mr. Murry received an official letter of termination from Jacobs on

February 5, stating that Jacobs was terminating his employment because of

AT&T's decision to remove him from the Project.  Mr. Murry expressed frustration

at the decision, and requested a letter of recommendation from Jacobs.  Mr.

Hatcher provided him with information about other open positions within Jacobs,

and encouraged him to apply. Mr. Murry had concerns about uprooting his family

11

and moving a long distance, however, and Jacobs did not have any other projects near where Mr. Murry lived. Mr. Murry also sent Mr. Hatcher and Jacobs HR an email providing feedback about the Project stating that he had not been given any technical responsibilities that would demonstrate his engineering abilities.

At the time of his termination, Mr. Murry was not aware of any concerns regarding his performance - he was not told that any peers or coworkers had commented negatively on work until AT&T raised the issue in response to his charge of discrimination filed with the Equal Employment Opportunity Commission ("EEOC"). It appears, however, that the concerns regarding Mr. Murry's performance were limited to AT&T employees and subcontractor technicians. Mr. Patton, Mr. Murry's supervisor within Jacobs, had a high opinion of Mr. Murry's abilities. Mr. Kensmoe, the senior engineer on the Jacobs team, was impressed with Mr. Murry's engineering knowledge and verbal and written communication skills. And Mr. Hatcher himself stated that his support of Mr. Murry's efforts to find another position at Jacobs was based on favorable feedback he received about Mr. Murry from other Jacobs employees.[11]

Following Mr. Murry's termination in February, it was Mr. Davis's intention that Mr. Kensmoe (who is Caucasian) "absorb" Mr. Murry's RF duties. Jacobs did not fill Mr. Murry's role on the Project until June 1, 2009, when it hired Antoine

---

[11] As noted below, Jacobs employees' opinions of Mr. Murry's performance are of limited probative value in determining whether Mr. Murry's performance satisfied AT&T's legitimate expectations. To the extent, however, that AT&T purports to have based its decision on feedback from Mr. Murry's peers, it is salient that other peers were confident in Mr. Murry's abilities.

Stalbert, an African-American male, to take his place. Since his termination, Mr. Murry has been unable to find work and has experienced financial and emotional difficulties as a result.[12]

II.

Mr. Murry filed charges with the EEOC against both Jacobs and AT&T, and received his right to sue letter on June 21, 2010.[13] He filed the instant lawsuit in state court on September 10, 2010, and Defendants timely removed the case to this Court. Mr. Murry's Complaint alleges six claims for relief: four against both AT&T and Jacobs, and two against only AT&T. Count I alleges violations of Title VII, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981 ("Section 1981") for racial discrimination, namely: harassment (i.e., hostile work environment), and discriminatory termination.[14] Count II likewise alleges violations of Title VII and Section 1981, but for retaliation due to Mr. Murry's opposition of racially discriminatory acts. Count III, against AT&T only, alleges tortious interference with contract. Count IV, also against AT&T only, alleges negligent hiring and

---

[12] Mr. Murry believes that part of his difficulty in finding work is due to a problem with his security clearance. He has not, however, offered any admissible evidence on this point.

[13] Mr. Murry has also filed charges with the Office of Federal Contract Compliance, and the Department of Defense-Office of the Inspector General.

[14] In his opposition to Defendants' motions for summary judgment, Mr. Murry asserts additional alleged violations committed by AT&T and Jacobs, invoking the Americans with Disabilities Act, the Health Insurance Portability and Accountability Act, Confidentiality of Medical Information Act, Occupational Safety and Health Administration Act, and Environmental Protection Agency Act. These claims cannot be considered at this late juncture, because a plaintiff may not amend his complaint by argument in a brief opposing summary judgment. Barclay White Skanska, Inc. v. Battelle Memorial Inst., 262 F. App'x 556, 563 (4th Cir. 2008) (unpublished); see also Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 617 (4th Cir. 2009) (citing Barclay).

13

retention of Mr. Morreale and Mr. Davis.  In Count V, Mr. Murry alleges that his termination violated 38 U.S.C. § 4212, the Vietnam-Era Veterans' Readjustment Act of 1974 ("VEVRA"), which entitles disabled veterans to preferential treatment in hiring on large federally financed projects.  Finally, Count VI alleges a violation of the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C. Gen. Stat. § 143-422.2.

III.

Summary judgment is proper only when, viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, there is no genuine issue of any material fact and the movant is entitled to judgment as a matter of law.[15]  FED. R. CIV. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001). Accordingly, summary judgment is appropriately granted against a party when that party has the burden of proof on a particular claim and is unable to make a showing – by affidavit, deposition testimony, answers to interrogatories, or admissions on file – of specific facts which would be (1) admissible at trial and (2) sufficient to support a jury verdict on each element of that claim.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence.  Id. at 249. In essence, the analysis concerns "whether the evidence presents a sufficient

---

[15] In addition, Mr. Murry's *pro se* submission in response to Defendants' motions for summary judgment has been reviewed with the "special judicial solicitude" reserved for pro se litigants. Brown v. Sears Automotive Ctr., 222 F. Supp. 2d 757, 763 (M.D.N.C. 2002) (quoting Beaudett v. City of Hampton, 775 F.2d 1274, 1277 (4th Cir. 1985)).

14

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

## IV.

A threshold issue is whether AT&T was Mr. Murry's "employer" for purposes of Title VII liability. Though it is undisputed that Jacobs was Mr. Murry's employer, an individual can have more than one "employer" under Title VII. See, e.g., Magnuson v. Peak Tech. Servs., Inc., 808 F. Supp. 500, 507-08 (E.D. Va. 1992) (commenting that "the broad, remedial purpose of Title VII . . . militates against the adoption of a rigid rule strictly limiting 'employer' status . . . to an individual's direct or single employer"). Accordingly, the fact that AT&T did not directly contract with Mr. Murry is not determinative of whether AT&T may be considered his joint "employer" under Title VII. See id. Whether a company is an employer for purposes of Title VII is a question of law for the court. Cilecek v. Inova Health Sys. Servs., 115 F.3d 256, 261 (4th Cir. 1997). To determine whether a putative employer should be considered an employer under Title VII, the Fourth Circuit applies the traditional common law of agency. Bender v. Suburban Hospital, Inc., 159 F.3d 186, 190 (4th Cir. 1998) (citing Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318 (1992)).[16] The degree of control a putative employer

---

[16] Title VII defines "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f). "Employer" is then defined as a "person [defined as including a corporation] ... who has fifteen or more employees" for a certain portion of a given year. Id. § 2000e(b). In circumstances such as these, where Congress has not explicitly defined "employee," the Supreme Court has determined that courts should apply the common law of agency. Darden, 503 U.S. at 323-27.

exercises over an employee is the "critical question."[17] Id.; see also Cilecek, 115 F.3d at 261. Other factors that may be relevant include: the control of when and how long the employee works; the source of instrumentalities of the employee's work; the duration of the parties' relationship; whether the hiring party has the right to assign additional work; the method of payment; whether the work is part of the regular business of the hiring party and how it is customarily discharged; the provision of pension benefits and other employee benefits; the tax treatment of the employee's income; and the parties' understanding as to whether an employment relationship exists. Id. The extent to which each of these factors is relevant may differ based on the particular circumstances in a given case.[18] See Cilecek, 115 F.3d at 260.

It is undisputed that Mr. Murry was paid by Jacobs, not AT&T, and that he did not consider AT&T to be his technical "employer." But there is abundant evidence regarding the "critical question," the amount of control exerted by AT&T over Mr. Murry. Though the contract between AT&T and Jacobs disavowed any employment relationship that could exist between AT&T and Jacobs employees,

---

[17] Cases involving temporary employees often employ the common law "loaned servant" doctrine rather than Title VII's joint employer analysis. The analysis is similar, applying "traditional agency principles" and asking whether the special employer controlled the manner and means of the temporary employee's work. See, e.g., Mullins v. Mechanics & Farmers Bank, 994 F. Supp. 680, 685 (M.D.N.C. 1997).

[18] Many of these factors, such as "duration of the relationship" and "regular business of the hiring party," while helpful in the context of determining whether an individual is an employee or an independent contractor, are less helpful in assessing whether an undisputed employee of one company should be considered a joint employee of another company.

16

AT&T supervisors clearly exerted control over the manner and means of Mr. Murry's employment. AT&T supervisors maintained day to day supervision and control of the Project tasks, and assigned work and various teams. This control and supervision occurred while apparently disregarding the authority of the Jacobs on-site supervisor, Mr. Patton. For example, the sole arguably "disciplinary" feedback that Mr. Murry received occurred at the behest of AT&T employees, in the AT&T supervisor's office, without the presence of Mr. Patton. Mr. Davis purported to have the ability to fire employees, and threatened to do so. These facts, coupled with AT&T's ability to terminate Mr. Murry's access to the employment site at will, are sufficient to outweigh any evidence that could have been provided regarding who paid Mr. Murry income and benefits. See Williams v. Grimes Aerospace Co., 988 F. Supp. 925, 936 (D.S.C. 1997) (finding joint employment relationship even though company did not pay wages or provide benefits to employee, because it had "authority to assign and control [plaintiff's] work detail; and, most importantly, the right to terminate her employment"). Accordingly, with respect to Mr. Murry's Title VII claims, AT&T is an "employer" within the meaning of Title VII and may be liable for adverse employment actions taken in violation of the statute.

For purposes of Mr. Murry's state law NCEEPA claim, however, this Court must determine whether AT&T should be considered a joint employer under North Carolina common law. Like federal courts, North Carolina recognizes a "joint

17

employer" theory, under which a person may be an employee of two different employers at the same time. <u>Brown v. Friday Servs., Inc.</u>, 460 S.E.2d 356, 360 (N.C. App. 1995). North Carolina applies a "right to control" test to determine employer status, using six non-exhaustive factors to determine whether that control exists, including (1) the source and nature of compensation, (2) the provision of tools necessary for the job, (3) control over the time at which work is performed, (4) control over the manner in which work is performed, (5) the right to terminate, and (6) the assignment of duties. <u>Youngblood v. North State Ford Truck Sales</u>, 364 S.E.2d 433, 437-38 (N.C. 1988). For the reasons discussed above with respect to Mr. Murry's Title VII claim, the latter four factors here weigh heavily in favor of employee status in this case. Accordingly, it is concluded that AT&T is a joint employer for purposes of Mr. Murry's NCEEPA claim as well.

Because either AT&T or Jacobs may be liable for violations of Title VII, Mr. Murry's evidence in response to Defendants' summary judgment motions will be addressed as to each Defendant, where applicable.

V.

In Count I, Mr. Murry alleges that AT&T and Jacobs violated Title VII and Section 1981 by discharging him, and by subjecting him to harassment in the form of a hostile work environment. Each claim is considered in turn.

A.

Under Title VII, it is an unlawful employment practice to "discharge any

18

individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1) (2000). Section 1981 provides in pertinent part that "all persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefits of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." Id. § 1981. The Fourth Circuit has held that § 1981 actions also serve to protect at-will employees from race discrimination. Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1018-19 (4th Cir. 1999), and the required elements of a prima facie case of employment discrimination are the same under Title VII and §1981. Gairola v. Com. of Va. Dep't of Gen. Servs., 753 F.2d 1281, 1285-86 (4th Cir.1985). Because the elements of a NCEEPA claim for wrongful discharge are also identical to those in a Title VII claim, Mr. Murry's NCEEPA claim (Count VI) will be considered along with his Title VII claim.[19] See N.C. Dep't of Corr. v. Gibson, 301 S.E.2d 78, 85 (N.C. 1983) (NCEEPA claims are evaluated under Title VII framework).

1.

---

[19] NCEEPA provides: "It is the public policy of this State to protect and safeguard the right and opportunity of all per-sons to seek, obtain and hold employment without discrimination, or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees." N.C. Gen. Stat. § 143-422.2. The Fourth Circuit has interpreted this as providing a limited right of action for wrongful termination based on race discrimination. McLean v. Patten Communities, Inc., 332 F.3d 714, 721 (4th Cir. 2003). As discussed below, the statute does not provide a right of action for other discrimination or retaliation claims.

To support a Title VII claim for discriminatory discharge, a plaintiff may provide direct evidence of discrimination, such as "conduct or statements that <u>both</u> reflect directly the alleged discriminatory attitude <u>and</u> that bear directly on the contested employment decision," or, in the absence of such direct evidence, the plaintiff may proceed using circumstantial evidence under the burden-shifting proof scheme established by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). <u>Taylor v. Virginia Union Univ.</u>, 193 F.3d 219, 232 (4th Cir. 1999) (quoting <u>Fuller v. Phipps</u>, 67 F.3d 1137, 1142 (4th Cir. 1995)) (emphasis added). Statements by employees who are not decision-makers do not bear on the contested employment decision; even statements by those making the decision to terminate an employee – but which are unrelated to the decisional process itself – do not satisfy a plaintiff's burden of proving discrimination. <u>Hill v. Lockheed Martin Logistics Mgmt, Inc.</u>, 354 F.3d 277, 286 (4th Cir. 2004) (citing <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)). In addition, "[t]o prove discriminatory animus [by direct evidence], the derogatory remark cannot be stray or isolated." <u>Brinkley v. Harbour Rec. Club</u>, 180 F.3d 598, 608 (4th Cir. 1999) (overruled on other grounds by <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90 (2003)).

Although Mr. Murry has provided evidence that an AT&T supervisor, Mr. Morreale, made a statement reflecting a discriminatory attitude, Mr. Morreale's comment does not "bear directly on the contested employment decision." Mr.

20

Morreale was not involved in Mr. Murry's termination; he himself had been removed from the Project a month before Mr. Murry was terminated. His allegedly discriminatory attitude therefore does not bear directly on AT&T's decision. See Hill, 354 F.3d at 286. Mr. Murry's allegations of Mr. Davis's subtly racist behavior likewise lack a "sufficient connection to the employment decision." Brinkley, 180 F.3d at 609. Even if Mr. Davis' uncivil behavior demonstrates a discriminatory attitude, it does not provide direct evidence related to AT&T's decision to terminate Mr. Murry. Cf. Loveless v. John's Ford, Inc., 232 F. App'x 229, 234 (4th Cir. 2007) (direct evidence of discrimination when supervisor stated that he needed "younger, more aggressive managers" and that plaintiff was a "F'n dinosaur" who would be "next" to be replaced and "should have been gone a long time ago").

As to Jacobs' decision to terminate Mr. Murry, there is no evidence of discriminatory attitude on the part of any Jacobs employee, and the comments and conduct of Mr. Morreale and Mr. Davis likewise do not bear directly on Jacobs' decision to terminate Mr. Murry. Accordingly, because Mr. Murry has not offered sufficient direct evidence that race was a motivating factor in his termination, he must provide evidence under the alternative method of proof established in McDonnell Douglas, 411 U.S. at 802.

2.

Under the McDonnell Douglas framework, a plaintiff's prima facie case of

21

discrimination creates an inference that the adverse employment action was based on unlawful discrimination. To establish a prima facie case of discriminatory discharge, Mr. Murry must show: 1) he is a member of a protected class; 2) he suffered an adverse employment action; 3) at the time of the adverse employment action, he was performing at a level that met the Defendants' legitimate job expectations; and 4) the position was filled by a similarly qualified applicant outside the protected class. Brinkley, 180 F.3d at 607. Other circumstances giving rise to an inference of unlawful discrimination may also be used to satisfy the fourth prong. E.E.O.C. v. Sears Roebuck & Co., 243 F.3d 846, 851 n.2 (4th Cir. 2001). If the plaintiff can establish a prima facie case, the employer must then give a legitimate, non-discriminatory reason for its action in order to rebut that inference. McDonnell Douglas, 411 U.S. at 802. An employer's burden is one of production, not of persuasion. Causey v. Balog, 162 F.3d 795, 800 (4th Cir. 1998). If the employer presents such a reason, the plaintiff can still prove discrimination by showing that the stated reason is a mere pretext for a decision motivated by discrimination. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000); McDonnell Douglas, 411 U.S. at 804.[20] A court's sole concern is whether a plaintiff's discharge was motivated by discrimination: "it is not [a court's] province to decide whether the reason was wise, fair or even correct, ultimately,

---

[20] Race need not have been the sole factor; a plaintiff needs only to show that race was a motivating factor, i.e., that is, that it "actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." Reeves, 530 U.S. at 141 (internal quotation marks and alterations omitted).

22

so long as it was truly the reason for the plaintiff's termination." DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) (quoting Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410-11 (7th Cir. 1997)).

It is undisputed that Mr. Murry is a member of a protected class. It is also undisputed that Mr. Murry suffered an adverse employment action.[21] Defendants argue, however, that Mr. Murry cannot establish the third and fourth elements of his prima facie case: i.e., that he cannot demonstrate that he was meeting Defendants' legitimate expectations or that he was replaced by a similarly qualified applicant outside the protected class. In addition, Defendants state that even if Mr. Murry could provide evidence to support a prima facie case, he could not raise a genuine factual issue as to pretext. Because the analysis differs as to each defendant, each is considered separately below.

a.

The burden a plaintiff bears in meeting a prima facie case "is not onerous." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). Accordingly, the Fourth Circuit has cautioned against the "danger" that courts might apply the "legitimate expectations" element of the prima facie case "too strictly." Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 516-17 (4th Cir. 2006). The "flexibility" of the

---

[21] As to Jacobs, this action was Mr. Murry's ultimate termination. As to AT&T, the adverse action was removing him from the Project. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) ("tangible employment action" occurs when "a significant change in employment status" is effected); Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 243 (4th Cir.1997), cert. denied, 522 U.S. 1116 (1998) (adverse employment action is defined as action affecting the terms, conditions, or benefits of employment).

23

McDonnell Douglas framework contemplates that a plaintiff may meet his burden on summary judgment by evidence that creates a question of fact whether the "proffered 'expectation' is not, in fact, legitimate at all." Id.; see also Inman v. Klockner Pentaplast of America, Inc., 347 F. App'x 955, 960 (4th Cir. 2009) (reversing grant of summary judgment because plaintiff presented sufficient evidence where jury could conclude that deficiencies claimed by defendant "were exaggerated to cover up the [improper] motivation . . . and that any such deficiencies were not sufficient to prevent his performance from being adequate").

Viewing the facts in the light most favorable to Mr. Murry, there is a question of fact regarding whether Mr. Murry was meeting AT&T's *legitimate* expectations.[22]  Mr. Murry has provided evidence that, prior to his termination, no one at AT&T had alerted Jacobs, or Mr. Murry himself, that his performance was deficient. See Reed v. Buckeye Fire Equip., 241 F. App'x 917, 927 (4th Cir. 2007) (finding that there was a triable issue of fact where there was no documentation of the alleged problems with plaintiff's performance or work habits). Cf. Warch, 435 F.3d at 517 (plaintiff had not produced sufficient evidence where he had admitted that his performance was lacking, and his supervisors had reprimanded him repeatedly, based on "concrete, specific observations").  Although AT&T makes much of the allegation that Mr. Murry purportedly slept on the job, Mr. Murry

---

[22] It is also noted that even if Mr. Dennis personally had no discriminatory motive, AT&T cannot insulate itself from liability, where Mr. Davis was principally responsible for recommending Mr. Murry's termination. See Hill, 354 F.3d at 287.

24

testified at his deposition that he had never done so, and that Mr. Morreale accepted his explanation that a change in blood pressure medication had caused him to feel unwell.

In addition to AT&T's failure to alert Jacobs of issues with Mr. Murry's performance, disputed issues of fact exist as to both Mr. Murry's RF capabilities and the necessity of those skills for his position. In AT&T's email to Jacobs detailing its reasons for removing Mr. Murry, Mr. Davis stated that Mr. Murry "has little technical and functional principles of the job," but did not describe the problem as relating to RF capabilities - a relevant fact in a communication to a company that would eventually provide Mr. Murry's replacement. And although Mr. Murry cannot meet his burden of proof merely by evidence that he believed or his co-workers believed that he was performing well, Warch, 435 F.3d at 518, Mr. Murry provided testimony from a supervisory co-worker (Mr. Patton) stating that there was no work performed at the Project by which Mr. Murry's RF engineering knowledge could have been measured.[23] In addition, to the extent that AT&T relies on affidavits describing peer and co-worker criticism of Mr. Murry's performance as a basis for its decision, testimony from Mr. Murry's peers and Jacobs supervisors reflecting favorably upon his performance calls into question whether Mr. Davis's, and therefore AT&T's, proffered expectations for Mr. Murry

---

[23] That is, Mr. Patton's testimony is not considered as evidence that Mr. Murry was meeting AT&T's job expectations, but rather as evidence that AT&T's proffered expectations may not be legitimate.

25

were legitimate.

Factual disputes between Mr. Davis's affidavit testimony and that of Mr. Kensmoe likewise undermine whether AT&T's expectations were honestly held. For instance, Mr. Kensmoe affirms that he and Mr. Murry provided Mr. Davis with a white paper with RF-related information, but that once the report was complete, Mr. Davis said he did not want it. This is at odds with Mr. Davis's testimony that he "learned" of Mr. Kensmoe's RF capabilities while making the decision to recommend Mr. Murry's removal from the project, and that Mr. Murry's lack of RF capabilities necessitated his termination.[24] In sum, a reasonable juror could find that AT&T's proffered expectations were not legitimate, and there is a genuine dispute of material fact regarding the third element of Mr. Murry's prima facie case.

i.

AT&T also argues that Mr. Murry cannot demonstrate that he was replaced by someone outside the protected class. Although a plaintiff generally must demonstrate that he was replaced by someone outside the protected class, in limited circumstances, other evidence that leads to an inference of unlawful

---

[24] It is noted that Mr. Davis's affidavit is also internally inconsistent. He states that the team was "leanly staffed," and that he had paired Mr. Murry with Mr. Hoffman to "further assess my team." He goes on to say that as of January 2009, a major RF project was imminent and that having "a person" with RF knowledge was important. But Mr. Davis then avers that he "learned" that Mr. Kensmoe had RF experience when he was making an "assessment" of the team while deciding to terminate Mr. Murry. If the team were leanly staffed to the point where Mr. Murry's RF abilities were of a critical concern - and if Mr. Davis was so concerned about an upcoming RF project that he paired Mr. Murry with another technician to determine his abilities - it seems questionable that he would only have "learned" of Mr. Kensmoe's RF experience as of the decision to terminate Mr. Murry from the Project.

26

discrimination may be shown to satisfy the fourth element in the prima facie case. Sears Roebuck & Co., 243 F.3d at 851 n.2. In fact, the Fourth Circuit has explicitly held that where the "firing and replacement hiring decisions were made by different decisionmakers, the plaintiff can make out a prima facie case without showing replacement by someone outside the protected class." Miles v. Dell, Inc., 429 F.3d 480, 485 (4th Cir. 2005). When one individual takes adverse action against a plaintiff, but another makes the replacement hiring decision, "the second individual's hiring decision has no probative value whatsoever as to whether the first individual's firing decision was motivated by the plaintiff's protected status." Id. at 489.

This is precisely the case here. AT&T took the adverse employment action of removing Mr. Murry from the Project. The fact that Jacobs hired another African-American employee to replace Mr. Murry "has no probative value whatsoever" as to whether AT&T's decision to remove Mr. Murry from the project was motivated by his race. See id. Moreover, the Jacobs replacement did not occur until three months after Mr. Murry's termination. In the meantime, Mr. Davis conceded in his affidavit that he intended for Mr. Kensmoe, who was white, to take over Mr. Murry's responsibilities. Given the flexibility of this prong of the prima facie case, Mr. Murry has made an adequate showing of a triable factual issue as to this element.

27

In sum, Mr. Murry has provided sufficient evidence to raise a genuine issue of material fact regarding the elements of his prima facie case. Accordingly, the burden shifts to AT&T to produce a legitimate and non-discriminatory reason for removing Mr. Murry from the Project. AT&T produces several such reasons. It argues that Mr. Murry was terminated based on: 1) feedback from one AT&T employee and two subcontractor employees that Mr. Murry did not have strong RF skills, 2) the government representative's concern about Mr. Murry's RF "knowledge base," along with his comment that he thought Mr. Murry "had a chip on his shoulder" and may have rolled his eyes during a conversation, 3) Mr. Dennis' belief that he saw Mr. Murry sleeping, and Mr. Dennis' report that the government representative told him that he had caught Mr. Murry sleeping.

In response, Mr. Murry must raise a genuine factual issue about the legitimacy of AT&T's stated reason, and provide sufficient evidence to raise a genuine factual issue regarding whether race was a motivating factor in defendant's decision. Although this is a close case, viewing the facts in the light most favorable to Mr. Murry, he has done so here.

ii.

First, as discussed in detail above, Mr. Murry has presented evidence that AT&T's expectations, and allegations of poor job performance, were not legitimate,

28

honestly-held expectations.[25]  Mr. Murry was removed from the Project without

prior warning to him or to Jacobs regarding performance issues. When Jacobs

asked for documentation of AT&T's reasons for insisting on Mr. Murry's removal,

Mr. Davis provided Mr. Hatcher with the following reasons: "[Mr. Murry] has little

technical and functional principles of the job. His position RF Engineer (Mid)

requires direct customer interaction - NOTE: In direct discussion with the customer

- his abilities where [sic] questioned," Mr. Murry "lacks the effectiveness of oral,

written, or listening skills required to perform assignments and interface with

management, coworkers and the customer," and Mr. Murry "lacks effectiveness in

dealing with peers, superiors and customer."  Some of AT&T's currently-proffered

reasons are merely elaborations of these objections. But AT&T did not mention the

allegations of Mr. Murry sleeping, or the fact that peers and co-workers had called

his technical capabilities into question.  The fact that an employer has offered

different justifications at different times may be probative of pretext.  See Sears

Roebuck & Co., 243 F.3d at 853 (quoting Tyler v. Re/Max Mountain States, Inc.,

232 F.3d 808, 813 (10th Cir. 2000) (stating that a court may be "disquieted . . .

by an employer who 'fully' articulates its reasons for the first time after the

decision was made")).

---

[25] The discussion of evidence supporting a material issue of fact with respect to the third
element of Mr. Murry's prima facie case is incorporated by reference here.

Although AT&T points to the government customer's concerns as a reason for terminating Mr. Murry, Mr. Murry describes his encounter with the government representative as lasting for only a few minutes, and including questions about components "from [a] previous contract" that were not familiar to Mr. Murry (and Mr. Kensmoe) because it was equipment relating to a different project. That is, Mr. Murry contends that neither the government customer nor AT&T could honestly have generalized information about his RF experience from this encounter. Similarly, Mr. Murry has provided evidence disputing Mr. Davis's statements regarding his pairing Mr. Murry and Mr. Hoffman on a RF task for assessment purposes. Mr. Murry states that he wasn't told who he would be working with, and his response to a related assignment indicates that he, Mr. Kensmoe, and another individual, were awaiting information requested from Mr. Hoffman. Furthermore, Mr. Murry contends that Mr. Davis disregarded the document containing the status update. Finally, Mr. Murry has provided evidence that Mr. Davis bragged about getting former subordinates fired for improper reasons, and that other Jacobs employees were concerned about retaliation. This evidence, while not directly probative of race, certainly undercuts Mr. Davis' credibility in articulating his non-discriminatory reasons for recommending Mr. Murry's termination. See Reeves, 530 U.S. at 148 ("A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification

is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

In sum, although it is a close case, it cannot be said that "no rational factfinder" could conclude that race was a motivating factor in AT&T's adverse action. Sears Roebuck & Co., 243 F.3d at 854. Accordingly, a genuine issue of fact exists as to whether AT&T's proffered non-discriminatory reason for removing Mr. Murry from the project was pretextual, and summary judgment is DENIED, as to AT&T, on the discriminatory discharge portions of Count I (Title VII and § 1981) and Count VI (NCEEPA).[26]

b.

Jacobs likewise contends that Mr. Murry cannot establish the third and fourth elements of a prima facie case. Whether Mr. Murry was meeting Jacobs' legitimate expectations is a closer case. As discussed above, the evidence Mr. Murry provided indicates that Jacobs was pleased with Mr. Murry's performance, to the point that Mr. Hatcher supported efforts to find Mr. Murry another position

---

[26] As noted above, the elements of a claim under NCEEPA and Title VII are identical. No cases in either federal or North Carolina state court, however, appear to have addressed what, if any remedy exists for wrongful termination in violation of NCEEPA. Mr. Murry may not, of course, obtain double recovery. And while the Fourth Circuit has acknowledged that a NCEEPA claim exists even where a plaintiff has a viable Title VII claim, it has never held that such a claim would entitle a plaintiff to recover damages above and beyond that allowed by Title VII. To do so would create perverse incentives for plaintiffs to circumvent Title VII's well-established remedial scheme. Percell v. IBM, Inc., 765 F. Supp. 297, 300 (E.D.N.C. 1991) (detailing reasons why court would decline to recognize private right of action under NCEEPA) (abrogated by McLean, 332 F.3d at 721); 1-7 LARSON, UNJUST DISMISSAL § 7.21[1][c] (Lexis 2011) (discussing, in context of state statutory schemes, courts' unwillingness to allow plaintiffs to circumvent statutory remedies through common law wrongful discharge claims); 6-1114 LARSON, EMPLOYMENT DISCRIMINATION § 114.11 (Lexis 2011) (same).

at Jacobs. But once AT&T removed Mr. Murry from the Project, Mr. Murry was unable to meet the job description for which he was hired, and therefore could not have continued to meet Jacobs' expectations. Because, however, it is plain that Mr. Murry has no evidence that Jacobs' reasons for terminating him were pretextual, it is assumed for purposes of this analysis that Mr. Murry could establish the third element of his prima facie case as to Jacobs.

As to the fourth prong, the decision to terminate Mr. Murry's employment was made by the same Jacobs decision-makers who ultimately hired Mr. Murry's replacement. Accordingly, the exception established in Miles, 429 F.3d at 485, does not apply with respect to Jacobs. Because Jacobs ultimately hired a member of the same protected class as Mr. Murry as Mr. Murry's replacement, Mr. Murry cannot successfully establish the fourth element of his prima facie case.

Nonetheless, even if Mr. Murry could successfully provide prima facie evidence against Jacobs, Jacobs has provided a legitimate, non-discriminatory reason for terminating his employment: AT&T would not allow Mr. Murry to continue working on the Project, and Jacobs had no open positions near Mr. Murry that Mr. Murry was willing to accept. Mr. Murry has not provided evidence to refute this; and has not disputed that Jacobs attempted to find him another position after his removal from the Project.

32

Accordingly, summary judgment will be GRANTED as to Jacobs on the discriminatory discharge portions of Count I (Title VII and §1981) and Count VI (NCEEPA).

B.

Mr. Murry also alleges in Count I that AT&T and Jacobs subjected him to harassment and a hostile work environment, in violation of Title VII and Section 1981. As with other Title VII claims, the elements of a Section 1981 hostile work environment claim parallel those of a Title VII hostile work environment claim. Spriggs, 242 F.3d at 184.[27] AT&T and Jacobs contend that Mr. Murry lacks sufficient evidence to support his hostile work environment claim. Even when the facts are viewed in the light most favorable to Mr. Murry, the Defendants are correct.

Under Title VII, it is an unlawful employment practice to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1) (2000). An employer's maintenance of a racially hostile work environment violates this provision, when a workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or

---

[27] Mr. Murry's NCEEPA claim (Count VI) is ambiguous; it is unclear whether he seeks relief for all discriminatory or retaliatory treatment alleged elsewhere in his Complaint. Compl. ¶ 53. NCEEPA, however, only provides a private right of action for wrongful discharge, and not for hostile work environment claims. See Jones v. Duke Energy Corp., 43 F. App'x 599, 600 (4th Cir. 2002). Accordingly, to the extent Mr. Murry alleges harassment/hostile work environment in violation of NCEEPA, summary judgment as to that claim is GRANTED as to both defendants.

pervasive to alter the conditions of the victim's employment." Jordan v. Alt. Res. Corp., 458 F.3d 332, 339 (4th Cir. 2006) (quoting Harris v., Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

To survive summary judgment on his claims of a racially hostile work environment, Mr. Murry must demonstrate that a reasonable jury could find that the harassment was "(1) unwelcome; (2) based on [his] race; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere." Spriggs, 242 F.3d at 183. In addition, Mr. Murry must present sufficient evidence that "there is some basis for imposing liability" on AT&T, and on Jacobs. Id. at 184.[28] To determine whether race-based harassment is "sufficiently severe or pervasive," courts analyze the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. The conduct must be objectively hostile or abusive, and the victim must also perceive the environment to be abusive. Lissau v. Southern Food Serv., Inc., 159 F.3d 177, 183 (4th Cir. 1998); see also Harris, 510 U.S. at 21 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment . . . is beyond Title VII's purview."). "[O]ff-hand comments, and

---

[28] Generally, "employers are liable only for their own negligence in failing, after actual or constructive knowledge, to take prompt and adequate action" to stop the harassment. Mikels v. City of Durham, 183 F.3d 323, 332 (4th Cir. 1999).

isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Jordan, 458 F.3d at 339 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). Accordingly, a hostile work environment "generally result[s] only after an accumulation of discrete instances of harassment." Id.

In this case, Mr. Murry has not provided sufficient evidence for a reasonable jury to find that the harassment "based on [his] race" was "sufficiently severe or pervasive" to alter the terms and conditions of his employment. Plaintiffs "must clear a high bar" in order to prove this element. E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008). It is undisputed that one supervisory AT&T employee, Mr. Morreale, made a racist, reprehensible, and derogatory comment that was directed at Mr. Murry and another black employee. While this comment was severe and arguably threatening, it is also undisputed that the incident was not repeated: Mr. Murry has not alleged, nor provided evidence, that any other employee of AT&T or Jacobs used racist language at any other point. See Jordan, 458 F.3d at 339-340 (comment was "unacceptably crude and racist" but was "a singular and isolated exclamation"). Indeed, Mr. Morreale was removed from the Project around a month after he made the offensive comment.

Mr. Murry's only other allegation regarding racially-charged behavior is that Mr. Davis would purposely ignore Mr. Murry and Mr. Patton while greeting nearby white employees. Though such behavior is indubitably offensive and rude, Title VII

35

"does not set forth a general civility code for the American workplace." Burlington

Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (commenting that

"snubbing" is not actionable under Title VII). This evidence, even when viewed in

the light most favorable to Mr. Murry, is not sufficient to demonstrate harassment

so "severe or pervasive" to alter the terms and conditions of Mr. Murry's

employment.

　　　To be sure, Mr. Murry has also provided evidence that Mr. Davis and Mr.

Morreale at times acted inappropriately or were generally unpleasant to the Project

employees. But Mr. Murry has not demonstrated that such behavior was directed

at him "because of" his race; rather, it is undisputed that – aside from the two

pieces of evidence discussed above – Mr. Davis's and Mr. Morreale's coarseness

was directed at all employees, regardless of race. And only harassment that is

"based on" a plaintiff's race is actionable. Hartsell v. Duplex Prods., Inc., 123

F.3d 766, 772 (4th Cir. 1997); see also Lack v. Wal-Mart Stores, Inc., 240 F.3d

255, 262 (4th Cir. 2001) (fact that other employees who were not members of

protected class complained about supervisor behavior "undercut[] [the second

element of plaintiff's] claim to a substantial extent" because it "compel[led] the

conclusion that [the supervisor] was just an indiscriminately vulgar and offensive

supervisor"). As the Fourth Circuit has held, "Title VII was not designed to create a

federal remedy for all offensive language and conduct in the workplace." Hopkins

v. Baltimore Gas & Elec. Co., 77 F.3d 745, 754 (4th Cir. 1996); Hartsell, 123 F.3d

at 773 (finding that plaintiff could not withstand summary judgment based on allegations that supervisors were "difficult to work with, insensitive, immature, and even insulting," where she could not demonstrate that such behavior was sex-based harassment).

In sum, the evidence offered by Mr. Murry stands in stark contrast to the evidence in cases in which hostile work environment claims have survived. See, e.g., Spriggs, 242 F.3d at 185 (describing supervisor's "incessant" use of repugnant terms including "n-----," "monkey," and "black bitch," which caused plaintiff to complain "several times" to his supervisors); E.E.O.C. v. Cent. Wholesalers, Inc., 573 F.3d 167, 176 (4th Cir. 2009) (finding that a reasonable jury could find that the race-based harassment was objectively severe or pervasive where "co-workers used the word n* * * *r ... on a regular basis, and at least one co-worker used the word 'pretty much every day,'" another co-worker called plaintiff "a black stupid n* * * *r, [and two other coworkers] kept blue-colored mop-head dolls in their offices and had the dolls hanging from nooses which were tied around the dolls' necks"). Accordingly, this case is "so far from the paradigmatic case" of a race-based hostile work environment that summary judgment is warranted, because no reasonable jury could find that the alleged race-based harassment is sufficiently "severe or pervasive." See Hartsell, 123 F.3d at 773. Summary judgment is therefore GRANTED as to both Defendants on Mr. Murry's harassment and hostile work environment claim.

37

VI.

In Count II, Mr. Murry alleges that AT&T and Jacobs terminated him in retaliation for opposing an unlawful discriminatory practice, in violation of Title VII and Section 1981.[29]  Under Title VII, it is an unlawful employment practice for an employer "to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a) (2000).  Section 1981 encompasses retaliation claims, and the same elements apply to it as to Title VII.  CBOCS West, Inc. v. Humphries, 553 U.S. 442, 457 (2008); Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 543 (4th Cir. 2003) (applying the same requirements to retaliation claims under section 1981 and Title VII).  In order to establish a prima facie case of retaliation under Title VII, a plaintiff must prove (1) that he engaged in a protected activity; (2) that an adverse employment action was taken against him; and (3) that there was a causal connection between the first two elements. Dowe v. Total Action Against Poverty, 145 F.3d 653, 656 (4th Cir.1998).

When a plaintiff alleges he was retaliated against for opposing discriminatory behavior, the first element of the prima facie case requires that the protected activity respond to a practice that "the employee reasonably believes is unlawful."

---

[29] As discussed with respect to Mr. Murry's hostile work environment claim, it is unclear whether Mr. Murry pleads retaliation in violation of NCEEPA. Compl. ¶ 53.  Because NCEEPA does not provide a private right of action for retaliation, Jones, 43 F. App'x at 600, to the extent Mr. Murry alleges retaliation in violation of NCEEPA, summary judgment as to that claim is GRANTED as to both defendants.

38

Jordan, 458 F.3d at 338. This requires both a subjective component – the employee's good faith belief that the employer is engaging in an unlawful practice – and an objective component – that the employee's belief is objectively reasonable in light of the facts.  Id.  To demonstrate a causal connection between the first two elements, the plaintiff must prove that the employer knew of the protected conduct. Causey, 162 F.3d at 803 (defendant's knowledge of the protected activity is "essential" to a retaliation claim).  As a practical matter, an employer cannot terminate someone *because of* that individual's opposition to an unlawful practice if the employer does not know that the individual opposed the practice.  Dowe, 145 F.3d at 657 ("the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case").

As discussed in the section concerning Mr. Murry's discriminatory discharge claim, it is undisputed that Mr. Murry suffered an adverse employment action. Nonetheless, Mr. Murry's retaliation claim founders on the first and third elements of the prima facie case.

Mr. Murry contends that he was terminated for opposing racially discriminatory acts.  The only discriminatory acts that Mr. Murry identifies are Mr. Morreale's derogatory comment and Mr. Davis's tendency to ignore African-American employees while acting friendly towards white employees.  Viewing the facts in the light most favorable to Mr. Murry, it appears that he opposed Mr.

39

Morreale's comment by asking Mr. Patton to report the incident to Mr. Hatcher. But it is far from clear that Mr. Murry opposed discriminatory behavior within the meaning of Title VII. At his deposition, Mr. Murry testified that the concern he reported to Mr. Patton was that Mr. Davis "didn't appear to particularly care for me" - Mr. Murry did not mention the racial component as being reported to Mr. Patton.

But even if Mr. Murry's discussions with Mr. Patton regarding Mr. Davis could be construed as opposition activity, Mr. Murry has not provided evidence that he believed that AT&T or Jacobs was engaging in an unlawful employment practice by virtue of Mr. Morreale's racist comment or Mr. Davis's practice of ignoring him. And whether or not Mr. Murry subjectively believed that these actions violated the law, such a belief may not have been reasonable under the controlling law in this Circuit. Jordan, 458 F.3d at 339-340 (employee's termination after complaining of coworkers' isolated racist comment could not be retaliation as a matter of law, because belief that such a comment constituted an unlawful employment practice was not objectively reasonable).

Furthermore, even assuming *arguendo* that Mr. Murry could demonstrate that he engaged in protected activity, he has not provided sufficient evidence to demonstrate a causal connection between his termination (or removal from the Project) and any complaint that he reported to Mr. Patton. AT&T has provided evidence that neither Mr. Davis nor Mr. Dennis were aware of who at Jacobs

40

complained about Mr. Morreale's comment; Mr. Murry has not provided anything to discount their sworn statements.[30] Mr. Murry likewise has not provided any evidence that AT&T had knowledge that he or anyone complained about racist behavior on the part of Mr. Davis.  Mr. Patton's affidavit merely states that he heard Mr. Hatcher remind the AT&T supervisors that Mr. Patton should be treated as the Jacobs lead on-site.  Any other belief that Mr. Murry or Mr. Patton may have about what Mr. Hatcher addressed with AT&T is speculative, and cannot overcome the evidence offered by Defendants that neither Jacobs nor AT&T was aware of any complaint by Mr. Murry regarding racist behavior on the part of Mr. Davis or Mr. Morreale.

In sum, Mr. Murry has not provided sufficient evidence to make out a prima facie case of retaliation with respect to either Jacobs or AT&T, and summary judgment will be GRANTED as to Count II.

VII.

In his third claim for relief, Mr. Murry contends that AT&T tortiously interfered with Mr. Murry's at-will employment contract with Jacobs.[31] Compl. ¶

---

[30] Although Mr. Murry has provided evidence that Mr. Davis threatened to fire employees who complained about job assignments, it is undisputed that this behavior was directed at all employees, regardless of race.  Even if Mr. Davis were motivated by Mr. Murry's complaints about the state of the engineering department in recommending Mr. Murry's removal from the contract, Title VII is not "a general whistleblower statute": however wrongful such an action might be, it does not violate Title VII. See Lightner v. City of Wilmington, N.C., 545 F.3d 260, 264 (4th Cir. 2008) (commenting that plaintiff's "acknowledgment that he was fired to stop his internal investigation negates his claims of race and gender discrimination").

[31] Mr. Murry's opposition to summary judgment, Doc. 45 at 9-10, argues that AT&T and Jacobs somehow each interfered with or breached the AT&T-Jacobs contract. These contentions

42.  Under North Carolina law, a plaintiff must establish five elements to succeed in a tortious interference with contract claim:

> (1) a valid contract [existed] between plaintiff and a third person . . ., (2) the defendant kn[ew] of such contract, (3) the defendant intentionally induce[d] the third person not to perform the contract, (4) and in doing so act[ed] without justification, [and] (5) … actual damage [resulted].

United Labs., Inc. v. Kuykendall, 370 S.E.2d 375, 387 (N.C. 1988).

Even viewing the facts in the light most favorable to Mr. Murry, he has not provided sufficient evidence to withstand summary judgment.  Specifically, Mr. Murry has not provided evidence that AT&T intentionally induced Jacobs to terminate Mr. Murry's employment.[32]  Although AT&T terminated Mr. Murry's access to the Project site, there is no evidence before the Court that AT&T knew, or intended, by this request, that Mr. Murry would lose any and all employment with Jacobs.  See Ratledge v. Sci. Applic. Int'l Corp., No. 1:10-cv-239, 2011 WL 652274, at *5 (E.D. Va. Feb. 10, 2011) (applying analogous element of Virginia

---

have no relevance to the allegations in his Complaint, which focuses solely on AT&T's alleged interference with his own contract for employment. AT&T and Jacobs's purported non-adherence to some of the terms of their own contract is inapposite in this action, except to the extent that it bears upon the issue of AT&T as a joint employer.

[32] AT&T also argues that its actions in removing Mr. Murry's from the Project (and Mr. Davis's recommendation of his removal) were justified.  Generally, non-outsiders to a contract (i.e., parties that have some legitimate business interest affected by the contract) have a qualified immunity for inducing non-performance, but this qualified privilege "is lost if exercised for motives other than reasonable, good faith attempts to protect the non-outsider's interests in the contract interfered with."  Bloch v. The Paul Revere Life Ins. Co., 547 S.E.2d 51, 60 (N.C. App. 2001) (citations omitted).  Because this affirmative defense involves a question of motive, it would be inappropriate to reach this issue on summary judgment. Robinson, Bradshaw & Hinson, P.A. v. Smith, 498 S.E.2d 841, 851 (N.C. App. 1998) (legal malice and bad motive present question for factfinder on tortious interference claim). Because it is concluded that Mr. Murry has not forecasted evidence that would meet an essential element of his claim, however, it is unnecessary to reach this defense.

42

tortious interference common law and concluding that plaintiff was unable to show that Defendant contractor had knowledge it was interfering with plaintiff's employment contract with subcontractor by removing her security clearance and access to work on a particular site); Ellsworth v. URS Const. Servs., No. 04 C 3499, 2008 WL 4216351, at *9 (N.D. Ill. Sept. 12, 2008) (applying analogous element of Illinois tortious interference common law and concluding that plaintiff had provided no evidence indicating that defendant intended to cause discharge instead of reassignment).

Both Mr. Davis and Mr. Dennis state in their affidavits that they expected that Mr. Murry would be reassigned to a different Jacobs project. See Esposito v. Talbert & Bright, Inc., 641 S.E.2d 695, 697 (N.C. App. 2007) (affirming summary judgment where defendants produced sworn affidavits that defendants did not intentionally induce termination of plaintiff's employment, where "any inference drawn from defendants' statements and conduct suggesting otherwise is too tenuous to defeat summary judgment"). Mr. Murry has provided no evidence to contradict this claim, and there is no evidence in the record to suggest that AT&T intended to cause Jacobs to discharge Mr. Murry instead of reassigning him. Mr. Murry's evidence proves only that AT&T desired to remove Mr. Murry from the Project. It does not demonstrate that AT&T intentionally induced Jacobs to terminate Mr. Murry's employment in entirety. Indeed, the evidence in this case indicates that Mr. Murry had some opportunity to continue working for Jacobs

after he was read off of the Project: it is undisputed that Jacobs attempted to find Mr. Murry another position at Jacobs once he was unable to continue at the Project.

Simply put, even viewing the materials before the Court in the light most favorable to Mr. Murry, Mr. Murry has not set forward any evidence to suggest that AT&T or Mr. Davis knew – let alone intended – that removing him from the Project would result in the loss of his employment with Jacobs. As such, because he has failed to forecast evidence demonstrating he will be able to meet an essential element of proof of his tortious interference claim at trial, summary judgment as to Count III is warranted, and will be GRANTED.

## VIII.

In his fourth claim, Mr. Murry seeks to hold AT&T liable for negligent hiring and retention of Mr. Morreale and Mr. Davis, in violation of North Carolina common law.  To prove such a claim, Mr. Murry must demonstrate that: the allegedly incompetent employee committed a tortious act resulting in injury to Mr. Murry, and that prior to that act, the employer knew, or had reason to know, of that employee's incompetency. Graham v. Hardee's Food Sys., Inc., 465 S.E.2d 558, 560 (N.C. App. 1996) (citing Hogan v. Forsyth Country Club Co., 340 S.E.2d 116, 124 (1986)).  This claim requires an underlying common law tort: Title VII and Section 1981 may not serve as the predicate tortious acts. Jackson v. FKI

44

<u>Logistex</u>, 608 F. Supp. 2d 705, 708 (E.D.N.C. 2009) (relying upon <u>McLean</u>, 332 F.3d at 721).  Mr. Murry's claim as to AT&T's retention of Mr. Morreale fails. First, Mr. Murry has not alleged any underlying tort committed by Mr. Morreale. The squirrel comment, while racist, would not support a tort claim - nor has Mr. Murry pled any underlying tort claim as to Mr. Morreale. Moreover, there is no evidence in the record to suggest that *prior* to Mr. Morreale making that comment, AT&T knew or had reason to know that Mr. Morreale had any propensity towards a tortious act. As to Mr. Davis, while Mr. Murry has alleged tortious interference with contract, as discussed above, summary judgment will be granted as to that claim. "When underlying torts that form the basis of Plaintiff's negligent supervision claim fail as a matter of law, then one of the *prima facie* elements of negligent supervision also fails." <u>Bond v. Rexel, Inc.</u>, No. 5:09-CV-122, 2011 WL 1578502, at *9 (W.D.N.C. Apr. 26, 2011) (citing <u>Hartsell</u>, 123 F.3d at 772-74). Because Mr. Murry's tortious interference with contract claim fails, his negligent supervision claim likewise fails. Accordingly, summary judgment will be GRANTED as to Count IV.

## IX.

Mr. Murry bases his fifth claim for relief on Section 402 of The Vietnam Era Veterans' Readjustment Act of 1974, which requires that government contractors take affirmative action to employ and advance in employment "covered" veterans, including disabled veterans. 38 U.S.C. § 4212 (previously codified at 38 U.S.C. §

45

2012 and since redesignated, <u>see</u> Pub. L. 102-83 § 5 (Aug. 6, 1991), 105 Stat. 405, 406). This statute, however, provides only for administrative enforcement through the Department of Labor and does not authorize a private right of action. <u>Armstrong v. Rolm A. Siemans Co.</u>, 129 F.3d 1258, 1997 WL 705376, at *3 (4th Cir. 1997) (unpublished) (upholding dismissal of claim under 38 U.S.C. § 4212); <u>Barron v. Nightingale Roofing, Inc.</u>, 842 F.2d 20, 22 (1st Cir. 1988) (no private right of action under 38 U.S.C. § 2012). Accordingly, summary judgment will be GRANTED as to Count V.

X.

In sum, for the reasons stated above, Jacobs's Motion for Summary Judgment (Doc. # 32) will be GRANTED in entirety. AT&T's Motion for Summary Judgment (Doc. # 34) will be DENIED as to Counts I and VI, with respect only to Mr. Murry's claim of discriminatory discharge, and GRANTED as to all remaining claims.

This the 5th day of April, 2012.

  /s/  N. Carlton Tilley, Jr.  

Senior United States District Judge

46